AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

| LODGED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| 2/19/2026 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___KM___ DEPUTY |

| FILED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| 2/19/26 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___cv___ DEPUTY |

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

Ethan Komiti,

Defendant.

Case No. 2:26-mj-00939-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, Steven M. Low, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of February 17, 2026, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Steven M. Low*
Complainant's signature

Steven M. Low, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 2/19/26

Judge's signature

City and state: Los Angeles, California

Hon. Margo A. Rocconi, U.S. Magistrate Judge
Printed name and title

AUSA: Christina R.B. López x2475

**AFFIDAVIT**

I, Steven Low, being duly sworn, declare and state as follows:

## I. **INTRODUCTION**

1. I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so employed since April 2025. I am currently assigned to the Los Angeles International Airport ("LAX") and have been assigned to that station since January 2026. My responsibilities include the investigation of federal criminal laws, including crimes involving narcotics importation and smuggling, intellectual property rights violations, smuggling or importation of counterfeit goods, and human trafficking.

2. I have completed the Criminal Investigator Training Program (CITP) at the Federal Law Enforcement Training Center in Glynco, Georgia, which included training in the investigation of various crimes. Prior to becoming an HSI SA, I was a data scientist for approximately five years.

## II. **PURPOSE OF AFFIDAVIT**

3. This affidavit is made in support of a criminal complaint against Ethan KOMITI ("KOMITI") for a violation of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance) (the "Subject Offense"). This affidavit is also made in support of search warrants for KOMITI's two cell phones (the "SUBJECT DEVICES"), namely:

   a. one light purple Apple iPhone 17, IMEI: 35 350258 426873 2, S/N JXL3WGCF96, seized from KOMITI's person on

February 18, 2026 ("SUBJECT DEVICE 1"), as described in Attachment A; and

      b.   one black Samsung A20 seized from KOMITI's person on February 18, 2026 ("SUBJECT DEVICE 2"), as described in Attachment A.  The items to be seized are described in Attachment B.  Attachments A and B are incorporated herein by reference.

    4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III. SUMMARY OF PROBABLE CAUSE

    5.   On February 17, 2026, U.S. Customs and Border Protection ("CBP") notified HSI that approximately 17.74 kilograms of methamphetamine was found in KOMITI's checked suitcase at LAX.  KOMITI was scheduled to depart LAX on an outbound flight to Auckland, New Zealand with the checked luggage containing methamphetamine.

## IV. STATEMENT OF PROBABLE CAUSE

6. Based on my review of law enforcement reports, conversations with law enforcement officers, and my own knowledge of the investigation, I am aware of the following:

**A.   KOMITI Checks in Luggage Containing 17.74 Kilograms of Methamphetamine Intended for New Zealand**

7. KOMITI, a citizen of New Zealand, was scheduled to depart LAX on February 18, 2026, on a 12:00 a.m. flight from LAX to Auckland, New Zealand (American Airlines Flight 83). KOMITI had checked in a charcoal-colored suitcase under his name which was to be transported on the flight to New Zealand. The suitcase was affixed with an airline tag bearing the name "Komiti/Ethan Polom" and KOMITI later confirmed that the suitcase was his. A photograph of KOMITI's checked-in luggage is below:



8.    KOMITI was also traveling with one additional checked piece of luggage containing personal belongings.

9.    During an outbound inspection of luggage, LAX CBP officers searched KOMITI's suitcase. Based on my review of reports, personal examination of evidence, and my conversations with the officers, I know that CBP officers found black sealed packages inside of the suitcase. Each sealed package contained a white crystalline substance consistent in appearance with methamphetamine. The substance was not concealed within the suitcase and was readably accessible once the suitcase was opened. A photograph of the suspected methamphetamine as found in KOMITI's checked-in luggage is below:



10.   CBP officers field-tested the white crystalline substance, which returned a presumptive positive result for methamphetamine. According to the CBP officers that weighed the

4

substance, the gross weight of the recovered bags and their contents is approximately 17.74 kilograms.

11. At approximately 12:30 a.m., I arrived at the secondary inspection area of LAX. By that time, CBP officers had detained KOMITI and separated him from his personal belongings and cellphones (i.e., the SUBJECT DEVICES), both of which had been recovered from KOMITI's person. The methamphetamine had also been removed from KOMITI's checked luggage.

12. I spoke with the CBP officers who had performed the inspection of KOMITI's luggage, and the officers confirmed that methamphetamine had been found in KOMITI's luggage and that KOMITI was willing to speak with HSI. I placed the SUBJECT DEVICES in evidence bags for detention.

13. At approximately 1:10 a.m., HSI SAs D. Reeder, J. Kim, and I conducted an audio-recorded interview with KOMITI. I informed KOMITI of his <u>Miranda</u> rights. KOMITI provided written acknowledgement of his rights and agreed to speak with agents without an attorney present. KOMITI also provided me with written consent to search the SUBJECT DEVICES found in his possession.

14. During his interview, KOMITI said approximately two weeks earlier he responded to an advertisement on his Instagram feed from an account with the name "Drip District Lab" that was seeking hand couriers for clothing shipments from Los Angeles to Auckland, New Zealand. KOMITI was eventually contacted by an individual known only to him as "Harris" and offered a job to

transport clothing from Los Angeles to Auckland, New Zealand. KOMITI accepted the job and Harris bought him a plane ticket to Los Angeles.

15. According to flight records that I have reviewed, KOMITI landed at LAX on February 11, 2026, on American Airlines Flight 82 inbound from Auckland, New Zealand.

16. KOMITI stated that he communicated with Harris via WhatsApp on his phone. KOMITI said Harris was the only individual that he was in contact with throughout the process. KOMITI said Harris had an American accent and they never met in-person. KOMITI said Harris would call him every one or two days to give him updates on the arrival of the clothing packages.

17. KOMITI told me he stayed at an Airbnb in Burbank during his time in Los Angeles, and that it was paid for by Harris. KOMITI said that while he was in Los Angeles, he received two shipments from Harris at the Airbnb. The shipments were each delivered by an Uber driver a few days apart. Over WhatsApp, Harris instructed KOMITI to take a video of himself opening the first shipment. According to KOMITI, the shipment contained clothing and the video of him unpacking it is on his phone. KOMITI told us the second shipment had a padlock and that he was never asked to open it or confirm its contents. KOMITI stated that he never opened the second shipment. According to KOMITI, he was told that, upon returning to New Zealand, he would deliver the shipments to stores for resale.

18. KOMITI said "they" -- meaning Harris and his associates -- paid for the whole trip, including airfare, food,

6

and accommodations. According to KOMITI, "everything was paid for by them." KOMITI confirmed he received funds from Harris via a mobile app called Kast, which I know is a crypto-based money transfer application. KOMITI told me he received between $1,800 to $2,000 in monetary compensation from Harris for his part, in addition to the travel and lodging expenses. KOMITI denied knowledge that the shipments contained anything but clothing.

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

19. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale, and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

20.  As used herein, the term "digital device" includes each of the SUBJECT DEVICES.

21.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

8

been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain

9

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        e.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        f.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

23. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. **CONCLUSION**

24. For all the reasons described above, there is probable cause to believe that KOMITI violated the Subject Offense.

25. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offense will be found in the SUBJECT DEVICES, as described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 19 day of February, 2026.

HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE